# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

NO. 03-10-00101-CR
NO. 03-10-00102-CR

**Curtis Mayes Jr., Appellant**

**v.**

**The State of Texas, Appellee**

FROM THE DISTRICT COURT OF TRAVIS COUNTY, 147TH JUDICIAL DISTRICT
NOS. D-1-DC-09-904090 & D-1-DC-09-904091
HONORABLE WILFORD FLOWERS, JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

In two causes, a jury convicted appellant Curtis Mayes Jr. of the offense of robbery. *See* Tex. Penal Code Ann. § 29.02 (West 2003). In each cause, punishment was assessed at 29 years' imprisonment, with the sentences to run concurrently. In three points of error on appeal, Mayes challenges the admissibility of his pretrial and in-court identifications by the robbery victims and asserts that the evidence is factually insufficient to sustain his convictions. We will affirm the judgments.

## BACKGROUND

The State alleged that Mayes committed three aggravated robberies during the early morning hours of February 14, 2009. Three indictments were filed, each corresponding to one of the three victims: Mohamed Anany in cause number D-1-DC-09-904092; Alejandro Hernandez

in cause number D-1-DC-09-904091; and David Baker in cause number D-1-DC-09-904090. The causes were consolidated for trial.

Each of the three victims testified. Mohamed Anany, a taxicab driver, testified that at some time between 3:00 a.m. and 4:00 a.m., he had just finished his shift and stopped at a gas station to purchase some items from the convenience store. As he exited the store and walked toward his car, Anany was approached by a man with a gun who had been hiding behind Anany's vehicle. According to Anany, the man pointed the gun at his face and said, "Give me your money." Anany estimated that the man was approximately two feet away from him while he held the gun to his face and demanded money. Immediately thereafter, Anany recalled, another man "came around and started reaching for my pockets." This other man grabbed "a big wad of cash" from Anany's pants pocket. Meanwhile, the gunman continued to demand money from Anany until Anany told him, "Your friend took it, dude." The gunman and the other man then ran off toward a car that was parked in a driveway located between the gas station and an adjacent shopping center and drove away.

Anany described the getaway vehicle as "a foreign car, a small, green car," with a license plate number that included the letters "DPS." Anany described the gunman as a "skinny African American, tall. I would not say taller than average; maybe 5'10", 5'11", maybe almost 6', and wearing blue jeans and a gray shirt, long-sleeve gray shirt." The gun, according to Anany, "did not look real," but "look[ed] like a BB gun."

The second victim was Alejandro Hernandez, who testified that he was robbed while standing outside a Home Depot at approximately 5:45 a.m. According to Hernandez, he was

2

approached by a man holding a gun who yelled, "Hold them up, dude. Let me see your money." Hernandez recounted how the man pointed the gun at his eyes, his neck, and his stomach, and the gun was close enough to Hernandez that he could feel it against his skin. Hernandez also noticed, approximately ten or fifteen feet away from him, a small green car, identified by Hernandez as a Kia, with another male inside. As Hernandez attempted to explain to the gunman that he had no money on him, he heard the other man inside the car tell the gunman, "Cap him. He ain't no kin to me, anyway, so what the hell." Hernandez pulled a lighter out of his pocket and handed it to the gunman. The gunman asked Hernandez, "Is that all you've got?" When Hernandez answered affirmatively, the gunman demanded Hernandez's wallet. Hernandez complied, and the gunman then got into the car with the other man and drove away. Hernandez testified that the robbery lasted approximately five minutes.

Hernandez was unable to remember most of the license plate number on the car, although he did recall that one of the numbers was a "7." Hernandez described the gunman as a few inches shorter than Hernandez's height of 5'10", between 20 and 25 years old, and with a slender build, black hair, and black skin. According to Hernandez, the gunman was wearing what Hernandez described as a sleeveless, white "muscle shirt" and "parachute pants." The area where the robbery occurred, Hernandez explained, was partially illuminated by lights on or near the building, which enabled him to see the gunman. Hernandez added, however, that "the light never hit the other guy" in the car, so he was unable to describe him in much detail, although he could discern that the man was tall, had black skin and black hair, a white sleeveless shirt, and "grayish"

pants. Hernandez also described the gun as a black, "regular handgun . . . like a 9-millimeter or 45 or something like that," and not having a barrel. Hernandez testified that the gun looked real to him.

The third victim was David Baker, an employee of the Texas Health and Human Services Commission who also worked in the mornings as a delivery carrier for the Austin American Statesman. Baker testified that after he had finished his deliveries and returned home at approximately 8:00 a.m., he saw a "small green car, that pulled up, I would say a couple houses down, on the curb, from our house," and a man exit the vehicle and approach him. Baker soon noticed that the man was pointing a gun at him. According to Baker, the gunman began screaming and told him, "Give me your wallet. Give me your wallet. I'm not playing. This isn't a joke. Give me your wallet." Baker estimated that the gunman was approximately five feet away from him when he started yelling and then got close enough that Baker could feel the gun pressed against his stomach. As the gunman was yelling at him, Baker also observed another man standing on the driver's side of the car. Baker recalled the other man telling the gunman, "Come on, come on, hurry up. Let's go." The gunman then reached into Baker's pockets until he found Baker's wallet, grabbed it, and "ran off towards the car." The two men then drove away.

Baker described the gunman as "anywhere between [his] late teens to early twenties, 18 to 22," "maybe a couple of inches shorter" than Baker's height of 5'11", "pretty thin," and with black hair and "very dark" skin. Baker recalled the gunman wearing blue jeans, tennis shoes, and a white t-shirt with short sleeves. Baker described the other man as black, of similar age and build as the gunman but "a little bit taller," and wearing a backwards multicolored baseball cap, a white "basketball shirt or muscle shirt," and either blue jeans or sweat pants. Baker described the gun

4

as "black metallic" with "kind of a flat handle." He added, "I'm not too familiar with guns, but it appeared to be a semiautomatic pistol." The green car, Baker recalled, "was a small compact; looked like an import, like a Honda or Toyota." Baker also tried to remember the license plate number and could recall some of it: "I think it was DX7. It was either oh-PS or zero-PS."

Later that morning, at approximately 11:00 a.m., the Austin Police Department received a report of an automobile collision in which one of the cars involved had fled the scene. According to Officer Jesse Borunda, the responding officer, a witness to the collision described the fleeing vehicle as a green Kia with a license plate number of "Z70DPS." Shortly thereafter, other officers located the suspect vehicle and initiated a traffic stop. One of the officers, Tammy Barrett, testified that the driver of the vehicle was identified as Curtis Mayes while the passenger was identified as Xavier Pettit. When Borunda arrived at the scene, he observed that Mayes and Pettit were already in custody. When officers searched Pettit, a lighter similar to the one stolen from Hernandez was found on his person. Borunda also searched the interior of the vehicle and found a black BB gun under the passenger seat. Borunda testified that in his opinion, it looked like a real gun.

Because their vehicle matched the description of the vehicle reportedly used in the earlier robberies, Mayes and Pettit were then transported to the robbery unit of the police station for booking. Officer Billy Park, who was at the station when the men arrived, described Mayes as "wearing a white tank top or muscle shirt and long shorts or pants." He described Pettit as "wearing a white t-shirt and some sort of dark pants or long shorts."

5

Later that day, Hernandez and Baker were transported to the station to provide statements and identify the perpetrators. They were each interviewed separately by Detective Chris LeLeux. In addition to describing the robberies, the details of which we have summarized above, Hernandez and Baker were shown two photo lineups prepared by LeLeux, one of which included a photo of Mayes, and the other of which included a photo of Pettit. According to LeLeux, both Hernandez and Baker identified Mayes in the first lineup as the gunman, but were unable to identify Pettit in the second lineup. Hernandez and Baker each subsequently identified Mayes in court as the man who had robbed them.

The other victim, Anany, did not immediately report the robbery committed against him and was not interviewed until February 25, 2009. On that day, Anany came to the police station and provided a statement to Detective Deanna Lichter. In addition to describing the robbery committed against him, summarized above, Anany was shown two photo lineups prepared by Lichter. As with the lineups shown to Hernandez and Baker, one of the lineups included a photo of Mayes, while the other lineup included a photo of Pettit. However, the photos used in the lineups shown to Anany were different from the photos used in the lineups shown to Hernandez and Baker, including the photos of the suspects. After reviewing the lineups, Anany was unable to identify either Mayes or Pettit.

Other evidence considered by the jury included the testimony of Pettit, who testified on behalf of the defense. Pettit acknowledged that he had been charged with three aggravated robberies in connection with the above events. He explained that as part of a plea bargain with the State, he had pleaded guilty to two of the charges and had agreed to a sentence of twelve years'

6

imprisonment in exchange for the State dismissing the third charge and reducing the remaining two charges from aggravated robbery to robbery. Pettit testified that during the robberies, he was under the influence of Xanax, promethazine, and marihuana. As a result, he could not remember many of the details from the robberies. However, Pettit claimed that Mayes had not been with him when the robberies were committed. Instead, according to Pettit, the gunman was a person nicknamed "J. Rock," whose legal name Pettit did not know. Pettit's version of events was that he had borrowed the green Kia from Mayes's uncle, picked up J. Rock and then committed the robberies with him, "dropped him off wherever I dropped him off," and then picked up Mayes at his house. Later that morning, while Pettit was still driving the car and under the influence of narcotics, the automobile collision occurred. Afterwards, Pettit explained, he let Mayes drive the car because "there was too many drugs in my system. I couldn't drive no more." Shortly thereafter, Mayes and Pettit were apprehended by authorities. Other than Pettit, no other witnesses testified for the defense during the guilt/innocence phase of the trial.

The jury was unable to reach a verdict in cause number D-1-DC-09-904092, the robbery involving Anany (the victim who was unable to identify his robbers), and a motion for mistrial in that cause was granted. In the other two causes, the jury acquitted Mayes of aggravated robbery but found him guilty of the lesser-included offense of robbery. During punishment, Mayes pleaded true to an enhancement paragraph alleging that he had committed delinquent felony conduct as a juvenile, and other evidence was presented. At the conclusion of trial, the district court pronounced sentence in accordance with the jury's verdict, noted above. Mayes filed a motion for new trial which was overruled by operation of law. This appeal followed.

## ANALYSIS

**Motion to suppress identifications**

In his first issue, Mayes asserts that the district court erred in denying his motion to suppress Hernandez's and Baker's pretrial identifications of him as the gunman. In Mayes's view, the photo lineup shown to the victims was impermissibly suggestive and gave rise to a substantial risk of misidentification. In his second issue, Mayes claims that because the pretrial identifications were impermissibly suggestive, they tainted Hernandez's and Baker's in-court identifications.

The *Guzman* standard of review applies to a trial court's ruling on a motion to suppress evidence based on a claim that an impermissibly suggestive pretrial identification procedure violated the defendant's due process rights. *See Loserth v. State*, 963 S.W.2d 770, 771 (Tex. Crim. App. 1998) (citing *Guzman v. State*, 955 S.W.2d 85, 89 (Tex. Crim. App. 1997)); *Moore v. State*, 140 S.W.3d 720, 729-30 (Tex. App.—Austin 2004, pet. ref'd). Under this standard, almost total deference is afforded to the trial court's determination of the facts, especially when the trial court's findings are based on an evaluation of credibility and demeanor. *Moore*, 140 S.W.3d at 730. The same amount of deference is given to mixed questions of law and fact if the resolution of those ultimate questions turns on an examination of credibility and demeanor of the witnesses. *Id*. However, if mixed questions of law and fact do not relate to credibility and demeanor, then the trial court's determinations are reviewed de novo. *Id*.

An in-court identification is inadmissible when it has been tainted by an impermissibly suggestive pretrial photographic identification. *Luna v. State*, 268 S.W.3d 594, 605 (Tex. Crim. App. 2008) (citing *Ibarra v. State*, 11 S.W.3d 189, 195 (Tex. Crim. App. 1999)). The

8

test is whether, considering the totality of the circumstances, "the photographic identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." *Id*.; *see Simmons v. United States*, 390 U.S. 377, 384 (1968). This is a mixed question of law and fact that does not "turn" on an evaluation of witness credibility and demeanor. *Loserth*, 963 S.W.2d at 773. Accordingly, we apply a de novo standard of review. *Id*.; *Moore*, 140 S.W.3d at 730.

This review involves a two-step analysis: (1) whether the out-of-court identification procedure was impermissibly suggestive; and, if so, (2) whether that suggestive procedure gave rise to a very substantial likelihood of irreparable misidentification. *Barley v. State*, 906 S.W.2d 27, 33 (Tex. Crim. App. 1995) (citing *Simmons*, 390 U.S. at 384; *Cantu v. State*, 738 S.W.2d 249, 251 (Tex. Crim. App. 1987)). An analysis under these steps requires an examination of the "totality of the circumstances" surrounding the particular case and a determination of the reliability of the identification. *Id*. "Reliability is the linchpin in determining the admissibility of identification testimony." *Luna*, 268 S.W.3d at 605. Thus, even if the out-of-court identification procedure is found to be impermissibly suggestive, "the identification testimony will be admissible if the indicia of reliability outweigh the apparent corrupting effect of the unnecessarily suggestive pretrial occurrence." *Harris v. State*, 827 S.W.2d 949, 959 (Tex. Crim. App. 1992). "The burden is on the defendant to show by clear and convincing evidence that the in-court identification is unreliable." *Id*. This is a "difficult and heavy burden." *Herrera v. State*, 682 S.W.2d 313, 318 (Tex. Crim. App. 1984).

9

We first consider whether the out-of-court identification procedure was impermissibly suggestive. "Suggestiveness may be created by the manner in which the pre-trial identification procedure is conducted, for example by police pointing out the suspect or suggesting that a suspect is included in the line-up or photo array." *Barley*, 906 S.W.2d at 33. "Or it may also be created by the content of the line-up or photo array itself if the suspect is the only individual closely resembling the pre-procedure description." *Id*. However, "neither due process nor common sense requires" that the other pictures used in a photographic array exactly match the defendant's characteristics. *Turner v. State*, 600 S.W.2d 927, 933 (Tex. Crim. App. 1980). Rather, the array must show individuals who fit a rough description of the suspect, including the same race, general skin color, age, and height of the suspect. *Wilson v. State*, 15 S.W.3d 544, 553 (Tex. App.—Dallas 1999, pet. ref'd). "The mere fact that lineup participants do not perfectly match the physical description of the accused does not render a lineup impermissibly suggestive." *Id*.

Based on the record before us, we cannot conclude that there was anything impermissibly suggestive about either the manner in which the lineup was conducted or the content of the lineup. Detective LeLeux testified that Hernandez and Baker "were not together" when he showed each of them the photo lineups. Instead, they were interviewed individually and shown the lineups at separate times. Thus, Hernandez's examination of the lineups could not have influenced Baker's examination of the lineups, and vice versa. Moreover, prior to showing the victims the lineups, LeLeux provided them with written admonishments instructing them that "this group of photographs may or may not contain a picture of the person or persons who committed the crime now being investigated." The admonishments continued,

10

Keep in mind that hairstyles, beards and moustaches may be easily changed. Also, photographs may not always depict the true complexion of a person—it may be lighter or darker than shown in the photo. Pay no attention to any markings or numbers that may appear on the photo or any other differences in the type of style of the photographs. When you have looked at all the photos, tell me whether or not you see the person or persons who committed the crime. Do not tell other witnesses that you have or have not identified anyone.

The written admonishments were signed by both Hernandez and Baker. Additionally, LeLeux orally admonished the victims concerning the above and further informed them that the photos in the lineup "could be days old, months, maybe even upwards of a year old." LeLeux testified that he followed the same procedures for both Hernandez and Baker. We find nothing impermissibly suggestive in the manner in which Detective LeLeux conducted the lineup.

Nor do we find anything impermissibly suggestive in the content of the lineup. Detective LeLeux testified that he prepared the lineup by first selecting the most recent arrest photograph of Mayes in the police database and then finding five "filler" photographs in which the subjects appeared as similar as possible to Mayes's appearance. For example, LeLeux observed that Mayes had an "angry" or "sour" expression in his photograph, so LeLeux "chose individuals that I thought also had expressions that were similar." Also, LeLeux noticed that Mayes was not "looking . . . directly at the camera," so LeLeux "selected other individuals who were not looking straight at the camera." And, because Mayes was wearing a white t-shirt in the photograph, LeLeux made sure that Mayes was not "the only person wearing a white t-shirt." Finally, LeLeux testified that he placed the six photographs in "random order."

We have closely examined the photo lineup of Mayes. Consistent with LeLeux's testimony, the individuals in the lineup all appear to be young, African-American males with

11

similar hair, facial features, and general skin color as Mayes. At least two of the subjects in addition to Mayes have facial expressions that could be fairly characterized as "angry" or "sour." At least four of the subjects in addition to Mayes are not looking directly at the camera. And three of the subjects in addition to Mayes are wearing white shirts.

Despite these similarities, Mayes asserts that the photo lineup was impermissibly suggestive for three reasons: (1) his photograph was "centrally located on the bottom row, closest to the witness's field of vision," which, according to Mayes, "tended to suggest to the witness that the appellant was the person whom the police suspected"; (2) his photograph was "inherently prejudicial because it shows the appellant with an overtly hostile and threatening expression on his face"; and (3) "the expression on the appellant's face . . . was distinctly different from the expressions on the faces of the other five persons pictured in the lineup."

We cannot conclude that any of the above renders the photo lineup impermissibly suggestive. We are aware of no authority, and Mayes cites to none, holding that the photo of the suspect cannot be centrally located on the bottom row of the lineup or that such a location renders the lineup impermissibly suggestive. Nor is there anything in the record to indicate that Mayes's photo was "closest to the witness's field of vision" or that the victims' identifications were influenced in any way by the location of the suspect's photo in the lineup. We also do not agree with Mayes's assertion that his photograph was "inherently prejudicial" because of the expression on his face or that his facial expression was "distinctly different from the expressions on the faces of the other five persons pictured in the lineup." Mayes's characterization of his expression as "overtly hostile and threatening" is not supported by the record, as no witness testified to such a

12

characterization and LeLeux testified that Mayes's expression appeared to be only "angry" or "sour." And, although it is true that all six of the men in the lineup have slightly different facial expressions, Mayes's expression is not so dissimilar from the others as to make him appear conspicuous in the lineup. *See Cooks v. State*, 844 S.W.2d 697, 732 (Tex. Crim. App. 1992) (concluding that lineup participants do not need to "perfectly match" description of suspect and that "it is more important, for purposes of avoiding suggestive procedures, that appellant did not somehow appear conspicuous among the other participants"). In fact, two of the men whom Mayes characterizes as having "disdainful" or "arrogant" expressions (located in positions number two and six of the lineup) could be fairly characterized as having "angry" or "sour" expressions similar to that of Mayes.

Moreover, even if we were to find that the lineup was impermissibly suggestive, we could not conclude on this record that the procedure gave rise to a substantial likelihood of irreparable misidentification. We consider the following factors in determining whether an impermissibly suggestive procedure gave rise to a substantial likelihood of irreparable misidentification: (1) the witness's opportunity to view appellant at the time of the crime; (2) the witness's degree of attention; (3) the accuracy of the witness's prior description of the criminal; (4) the witness's level of certainty at the time of confrontation; and (5) the length of time between the offense and the confrontation. *Luna*, 268 S.W.3d at 605 (citing *Neil v. Biggers*, 409 U.S. 188, 199 (1972)). These five factors are to be viewed in the light most favorable to the trial court's ruling. *Ibarra*, 11 S.W.3d at 195-96; *Moore*, 140 S.W.3d at 731. The five factors, viewed in this manner, are then weighed de novo against "the corrupting effect" of the suggestive pretrial identification procedure. *Ibarra*, 11 S.W.3d at 195-96; *Moore*, 140 S.W.3d at 731.

13

First, both Hernandez and Baker testified that they were able to see the gunman during the robbery. Hernandez was able to see the gunman because of the lighting outside the Home Depot, while Baker was able to see the gunman because at the time of his robbery, it was dawn. Although both men acknowledged having vision impairments (Hernandez needed reading glasses and Baker wore eyeglasses because his "eyesight is not all that good, especially at that time of the morning"), neither victim indicated that their impairments prevented them from seeing the facial features of the gunman. Both victims also testified that the gunman was in close proximity to them during the robberies, so close that they could feel the gun against their skin. This close proximity, the district court could have reasonably inferred, likely enabled the victims to get a close look at the gunman. Additionally, Hernandez testified that his robbery lasted approximately five minutes, which would give him ample time to view the gunman.[1]

Second, Mayes concedes that the victims' "attention was focused on what was happening to them at the time." Mayes argues, however, that their attention may have been "split" between the gunman and his accomplice and that their attention was also focused on the gun itself. But the fact that there were other things on which the victims were focused during the robberies does not mean that they were inattentive to the man who was threatening them with a gun. In fact, both Hernandez and Baker were able to recall the words the gunman used during the robbery, which suggests that their attention was focused on him. Also, the fact that Hernandez and Baker were able

---

[1] Mayes argues that it is unlikely that the robbery actually lasted this long. However, there was no contrary evidence presented concerning the length of the robbery.

14

to recall many other details of the robberies, summarized above, indicates a high degree of overall attention during the robberies.

Third, while there were some inconsistencies and inaccuracies in Hernandez's and Baker's prior descriptions of the gunman,[2] they were not so significant as to render their identifications unreliable. In fact, Detective LeLeux testified that it was "normal" for crime victims to be able to recall some of the details of the perpetrator but not others. He explained, "It can be a function of the event that they're observing and relating happening quickly . . . fear; time of day, lighting . . . those are all factors." Despite being unable to correctly recall certain details, both Hernandez and Baker correctly identified important physical characteristics such as Mayes's approximate age, race, build, skin and hair color, and the color of his shirt.[3]

Fourth, the victims did not express any uncertainty in their identification of Mayes as the gunman, either while viewing the lineup or in court. They both were unable to identify the accomplice, and Hernandez informed LeLeux that he had difficulty remembering anything *other* than the gunman. However, neither victim indicated that he was uncertain regarding the gunman's identity.

Finally, both Hernandez and Baker identified the gunman within hours of their robberies. Hernandez estimated that he viewed the lineup "anywhere from 12:30 to 1:00," while

---

[2] The most notable of these discrepancies is that both Hernandez and Baker described the gunman as a few inches shorter than their respective heights of 5'10" and 5'11". However, Mayes is actually six feet tall. Also, neither witness described seeing any tattoos on the gunman, despite the fact that the name "Joyce" was tattooed across the front of Mayes's neck.

[3] However, Baker did not correctly identify the gunman as wearing a sleeveless shirt, although Hernandez did.

Baker estimated that he viewed the lineup at approximately 3:00 p.m. Mayes concedes in his brief that the "reliability of an identification is not affected by such a brief interval." *See Moore*, 140 S.W.3d at 732.

The above factors weigh in favor of finding that the victims' identifications of Mayes were reliable. Even assuming the lineup was impermissibly suggestive for the reasons Mayes asserts, such suggestiveness would not outweigh the above indicia of reliability. Considering the totality of the circumstances, we cannot conclude that Mayes satisfied his "difficult and heavy burden" to prove by clear and convincing evidence that "the photographic identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." Accordingly, we cannot conclude that the victims' in-court identifications were tainted by the pretrial procedure or that the district court erred by denying Mayes's motion to suppress the identifications.

We overrule Mayes's first and second points of error.

**Sufficiency of the evidence**

In his third point of error, Mayes asserts that the evidence is factually insufficient to sustain his convictions. However, in light of the recent decision of the Texas Court of Criminal Appeals in *Brooks v. State*, we will construe this point as a challenge to the legal sufficiency of the evidence. *See* 323 S.W.3d 893, 895 (Tex. Crim. App. 2010) ("[T]he *Jackson v. Virginia* legal-sufficiency standard is the only standard that a reviewing court should apply in determining whether the evidence is sufficient to support each element of a criminal offense that the State is required to prove beyond a reasonable doubt.").

In reviewing a challenge to the legal sufficiency of the evidence, we examine the evidence to determine whether any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *Id*.; *see Jackson v. Virginia*, 443 U.S. 307, 318 (1979). We review all the evidence in the light most favorable to the verdict, and assume the trier of fact resolved conflicts in the testimony, weighed the evidence, and drew reasonable inferences in a manner that supports the verdict. *Jackson*, 443 U.S. at 318; *see also Laster v. State*, 275 S.W.3d 512, 517 (Tex. Crim. App. 2009).

The jury found Mayes guilty of the offense of robbery. A person commits the offense of robbery if, in the course of committing theft and with intent to obtain or maintain control of the property, he (1) intentionally, knowingly, or recklessly causes bodily injury to another; or (2) intentionally or knowingly threatens or places another in fear of imminent bodily injury or death. Tex. Penal Code Ann. § 29.02. Mayes claims that "the evidence admitted was simply too weak to support the jury's verdict." We disagree.

As detailed above, both Hernandez and Baker identified Mayes as the person who had robbed and threatened them with what they believed to be a firearm. Neither victim expressed any uncertainty in their identifications. And, although there were some inconsistencies in their descriptions of Mayes, the jury could have reasonably discounted those discrepancies and instead credited the numerous similarities between the victims' descriptions of the robber.

Additionally, later in the morning on the same day the robberies were committed, Mayes was found driving the vehicle that was used in the robberies. He was found in the vehicle with Pettit, who admitted to being involved with the robberies. And inside the vehicle, officers

17

found a black BB gun that the jury could have reasonably inferred was the same weapon that had been used to commit the robberies.

Mayes further asserts that the jury's verdict is against the great weight and preponderance of the evidence, "considering the conflicting testimony of Xavier Pettit." Pettit, however, admitted to being under the influence of Xanax, promethazine, and marihuana during the events in question and could not remember many details of what happened during or after the robberies. Also, Pettit admitted that he considered Mayes to be like a brother to him. For these and other reasons, the jury was free to disregard Pettit's version of events and his claim that someone other than Mayes committed the crimes. Viewing the above evidence in the light most favorable to the verdict, we conclude that the evidence is legally sufficient to sustain Mayes's convictions.

We overrule Mayes's third point of error.

## CONCLUSION

We affirm the judgments of the district court.

_____

Bob Pemberton, Justice

Before Chief Justice Jones, Justices Puryear and Pemberton

Affirmed

Filed: March 18, 2011

Do Not Publish

18